**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WISEY'S #1 LLC,**<br><br>    **Plaintiff,**<br><br>        v.<br><br>**NIMELLIS PIZZERIA LLC;**<br><br>**MINELLIS PIZZERIA ENTERPRISES LLC;**<br><br>**and**<br><br>**DAVAR ASHGRIZZADEH,**<br><br>    **Defendants.** | **Civil Action No. 12-cv-1612 (JDB)** |

**MEMORANDUM OPINION**

After Wisey's #1 LLC ("Wisey's") brought federal statutory and state common law claims against Nimellis Pizzeria LLC, Minellis Pizzeria Enterprises LLC, and Davar Ashgrizzadeh (collectively "Nimellis"), the defendants filed counterclaims alleging four state common law torts against Wisey's for the actions of its employees. Wisey's has now moved to dismiss the counterclaims under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure state a claim upon which relief can be granted. For the reasons stated below, the Court will grant Wisey's motion to dismiss under Rule 12(b)(1) without reaching the Rule 12(b)(6) motion.

**FACTS**

Davar Ashgrizzadeh owns and operates Minellis Pizzeria Enterprises LLC, a defunct entity no longer operating, and Nimellis Pizzeria LLC. Am. Countercls. [Docket Entry 24] ¶ 7

1

(Jan. 9, 2013). Nimellis owns and operates a restaurant known as Café Romeo's located at 2132 Wisconsin Avenue NW in the District of Columbia. Id.

Nimellis' counterclaims stem from an alleged business feud that began around June 2011 when Café Romeo's started to offer smoothies. See id. ¶¶ 9, 11. "On or around June or August 2011," Nimellis alleges an agent, owner, or employee of Wisey's approached Ashgrizzadeh and demanded that Café Romeo's stop selling smoothies. Id. ¶¶ 9, 11. Wisey's is an active competitor in the Georgetown and broader District of Columbia smoothie market and is located at 1440 Wisconsin Avenue NW in the District of Columbia. Id. ¶¶ 4, 13. The agent, owner, or employee told Ashgrizzadeh that if Café Romeo's sold milkshakes instead of smoothies, then Wisey's and Café Romeo's could be "friends," but if Café Romeo's continued to sell smoothies, then Wisey's would destroy Café Romeo's business. See id. ¶ 11.

When Café Romeo's refused to stop selling smoothies, Nimellis alleges that Wisey's through its owner Nabeel Audeh and its employee Helal Awadallah began a defamatory campaign to embarrass Ashgrizzadeh and "destroy Café Romeo's underlying business." See id. ¶ 14. Many of the subsequent actions involved Ashgrizzadeh's status as a sex offender. See, e.g., id. ¶ 15. In 1996, Ashgrizzadeh pleaded guilty to a sex offense involving another adult, for which he served a two-year sentence and is listed on the sex offender registry in Virginia. See id. ¶ 16.

Nimellis alleges that in the summer of 2011, through its owners, agents, or employees—including Awadallah—Wisey's told its own customers that Ashgrizzadeh was a "psychopath" and a "child molester" while disseminating his sex offender registry information to them. See id. ¶ 15. Nimellis also alleges that in or around February 2012, Wisey's through its owners, agents, or employees sent text messages to Café Romeo's employees that contained Ashgrizzadeh's sex offender registry information. Id. ¶ 17.

In June 2012, Café Romeo's began trading as WISEATS/Wise Eats Café "as a reaction to the damages caused by the plaintiff's [Wisey's] behavior." Id. ¶ 18.[1] Café Romeo's trade changes led to Wisey's initial complaint in this action, which included claims of federal trademark infringement, federal unfair competition, and federal unlawful cybersquatting based on Nimellis' alleged infringement of Wisey's mark and menu, as well as the registration of www.wiseats.com. See Compl. [Docket Entry 1] ¶¶ 67, 79, 84 (Sept. 27, 2012). Nimellis alleges that after Café Romeo's began trading as WISEATS/Wise Eats Café, Wisey's harassment "began to escalate and become more aggressive." See Am. Countercls. ¶ 18.

"On or about" the end of May or June 1, 2012, Ashgrizzadeh allegedly found printouts of his sex offender registry information on cars and slid underneath apartment doors in his apartment complex in Virginia. See id. ¶ 19. Ashgrizzadeh saw Awadallah nearby with fliers, at which time Awadallah allegedly told him "[t]his is nothing. You'll see what's coming." See id. "In or around" June 3, 2012, Awadallah allegedly asked two of Ashgrizzadeh's employees whether they knew that Ashgrizzadeh had "raped a nine-year-old boy." Id. ¶ 23. Then, "[o]n or about" August 22, 2012 at around 2:00 p.m. or 2:30 p.m., Audeh allegedly arrived at Café Romeo's and accused Ashgrizzadeh of copying Wisey's menu while threatening to put Café Romeo's out of business. See id. ¶ 20. Audeh also allegedly said that Ashgrizzadeh had molested a nine-year-old boy and was a pedophile in front of several unnamed patrons and two named employees of Café Romeo's. See id. ¶ 20 & n.2. Two regular lunch customers present for the alleged incident have not returned since. See id. ¶ 22.

Around the end of August 2012, Awadallah allegedly approached Ashgrizzadeh at a Restaurant Depot in Virginia, where both restaurants purchased supplies. See id. ¶ 24. While

---

[1] Nimellis' amended counterclaims refers to "Café Romeo's" when describing events that occurred after the trade name change, so the Court will continue to refer to the restaurant as "Café Romeo's" as well.

3

Ashgrizzadeh was checking out, Awadallah asked the cashier whether she knew that Ashgrizzadeh[2] had "raped a nine-year-old boy" and "was a pedophile with mental issues." See id.

Finally, on September 7, 2012 around 10 p.m., Ashgrizzadeh was driving with two employees of Café Romeo's in Georgetown. See id. ¶ 25. When Ashgrizzadeh stopped at the corner of Potomac Avenue and M Street, NW, Awadallah shouted from the car next to him at the employees, asking whether they knew Ashgrizzadeh was a sex offender. Id.

Wisey's filed a complaint that included federal claims for trademark infringement, unfair competition and unlawful cybersquatting under the Lanham Act (collectively "Lanham Act claims"). See Compl. at 11. Nimellis responded with counterclaims, now amended, alleging common law defamation, tortious interference with prospective business advantage, anticompetitive conduct and intentional infliction of emotional distress (IIED). See Am. Countercls. ¶¶ 35, 39, 45, 57. Nimellis alleges that Wisey's actions have lost Nimellis former and potential customers of dine-in, takeout and delivery options, as well as damage to its reputation and goodwill. See id. ¶¶ 27-29. Currently before the Court is Wisey's motion to dismiss Nimellis' amended counterclaims.

**STANDARD OF REVIEW**

Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court—counter-plaintiff Nimellis here—bears the burden of establishing that the court has jurisdiction. See U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). Furthermore, because subject matter jurisdiction focuses on the Court's authority to hear the party's claims, a Rule 12(b)(1) motion "imposes on the court an affirmative obligation to ensure that it is acting

---

[2] The amended counterclaim states Awadallah asked the cashier if she knew that *Awadallah* had committed the act and had mental issues, but this appears to be a typographical error.

within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Therefore, the party's factual allegations in its counterclaims "'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

Federal courts are courts of limited subject matter jurisdiction, possessing only the powers granted by the Constitution and federal statute. Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994) (internal citations omitted). However, "[w]hen a federal court has an independent basis for exercising federal jurisdiction, it may, in certain circumstances, also exercise pendent, or supplemental, jurisdiction over related claims under state law." Women Prisoners v. District of Columbia, 93 F.3d 910, 920 (D.C. Cir. 1996).

A two-part test guides the supplemental jurisdiction analysis. See id. First, the court examines whether the state and federal claims "derive from a common nucleus of operative fact." See United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). If they do, the court has the authority under Article III of the Constitution to hear the state claim. See Women Prisoners, 93 F.3d at 920 (citing Gibbs, 383 U.S. at 725). Congress codified these principles in the supplemental jurisdiction statute, 28 U.S.C. § 1367. City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997) (citing 28 U.S.C. § 1367(a)).[3] If the court finds the claims do not derive from a common nucleus of operative fact, it cannot exercise supplemental jurisdiction and the claims must be dismissed under Rule 12(b)(1).

If the court does find that the federal and state claims are sufficiently related, section 1367(c) "confirms the discretionary nature of supplemental jurisdiction by enumerating

---

[3] "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

5

the circumstances in which district courts can refuse its exercise." Id. at 173. The court may within its discretion decline to exercise supplemental jurisdiction over a state claim that derives from a common nucleus of operative fact with a federal claim if:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Each of the section 1367(c) bases is an independent reason through which a court may decline supplemental jurisdiction. Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1266 (D.C. Cir. 1995).

## DISCUSSION

Because Nimellis' common law counterclaims do not derive from a common nucleus of operative fact with Wisey's Lanham Act claims, the Court does not have supplemental jurisdiction under section 1367(a). The Court also finds that, even it if had supplemental jurisdiction, it would exercise its discretion not to assert that jurisdiction under section 1367(c) because the counterclaims raise a novel issue of District of Columbia tort law and the counterclaims would substantially predominate over the Lanham Act claims.

### I.     Section 1367(a) Analysis

In order for the Court to assert supplemental jurisdiction over state common law claims, it must first determine that they "derive from a common nucleus of operative fact" with the federal claims over which there is original jurisdiction. Women Prisoners, 93 F.3d at 920 (quoting Gibbs, 383 U.S. at 725) (internal quotation marks omitted). "Claims derive from a 'common nucleus of operative fact' only if the plaintiff would ordinarily be expected to try them all in one judicial proceeding." Taylor v. District of Columbia, 626 F. Supp. 2d 25, 28 (D.D.C.

2009) (quoting Gibbs, 383 U.S. at 725). "[S]tate law claims do not derive from a common nucleus of operative facts if there is almost no factual or legal overlap between the state and federal claims." See Chelsea Condo. Unit Owners Ass'n v. 1815 A St., Condo. Grp., LLC, 468 F. Supp. 2d 136, 141 (D.D.C. 2007). Here, there is no legal overlap and only some background factual overlap. Thus, there is no common nucleus of operative fact to support supplemental jurisdiction.

A. Legal Overlap

The alleged Lanham Act claims are trademark infringement, unfair competition and unlawful cybersquatting. Their elements involve the companies' trademarks, the distinctive nature or secondary meaning of Wisey's trademark, the likelihood of confusion caused by Nimellis' allegedly infringing mark, and the bad faith[4] registration or use of a domain name confusingly similar to Wisey's mark. See 15 U.S.C. §§ 1114(1), 1125(a), (d); Sears, Roebuck & Co. v. Sears Fin. Network, 576 F. Supp. 857, 861 (D.D.C. 1983) (internal citation omitted); Hanley-Wood LLC v. Hanley Wood LLC, 783 F. Supp. 2d 147, 152 (D.D.C. 2011).

Conversely, the tort counterclaims focus on elements unrelated to the Lanham Act claims. The defamation claims examine the falseness and defamatory nature of alleged statements made by Wisey's employees to third parties regarding Ashgrizzadeh's sex offender history, whether the statements were made at least negligently, and what damages the statements caused. See Croixland Props. Ltd. P'ship v. Corcoran, 174 F.3d 213, 215 (D.C. Cir. 1999) (quoting Crowley v. North Am. Telecomm. Ass'n, 691 A.2d 1169, 1172 n.2 (D.C. 1997) (internal quotation marks omitted)). The tortious interference claims concern whether, with what intent, and to what extent those statements lost Nimellis repeat or prospective customers' future

---

[4] The bad faith determination is based upon nine factors that examine the history of the domain name and the defendant's actions relating to the domain name. See 15 U.S.C. § 1125(d)(1)(B)(i). That analysis does not examine broader bad faith context and motivations in a dispute beyond the domain name.

business. See Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995) (internal citations omitted). The anticompetitive conduct claim alleging attempted monopolization tests whether Wisey's defamatory and harassing statements were predatory and with an intent and probability of obtaining monopoly market power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993) (internal citation omitted).[5] The IIED claim addresses whether Wisey's employees' conduct rose to the level of being extreme and outrageous and whether the employees intentionally or recklessly caused Ashgrizzadeh severe emotional distress. See Khan v. Parsons Global Servs. Ltd., 521 F.3d 421, 428 (D.C. Cir. 2008) (quoting Darrow v. Dillingham & Murphy, LLP, 902 A.2d 135, 139 (D.C. 2006)). Tellingly, the Lanham Act and tort claims are not related such that the Court would "ordinarily be expected to try them all in one judicial proceeding," Gibbs, 383 U.S. at 725, and the adjudication of the counterclaims would be unaffected if the Court were to dismiss Wisey's Lanham Act claims. Accordingly, the claims do not legally overlap.

B. Factual Overlap

Although the counterclaims and Lanham Act claims are both part of the broader dispute between the businesses, they only share a set of general *background* facts. The *operative* facts are those relating directly to the federal Lanham Act claims concerning the alleged actions taken by Nimellis. See Black's Law Dictionary 670 (9th ed. 2009) (operative fact is one "that constitutes the transaction or event on which a claim or defense is based").

State common law claims that only "relate generally" to federal claims through a broader dispute and do not share any operative facts are insufficient for supplemental jurisdiction. Chelsea Condo., 468 F. Supp. 2d at 138-39 (finding no supplemental jurisdiction over several

---

[5] Failure to state a claim for attempted monopolization under Sherman Act elements signifies failure to state the claim under the D.C. Code. Dial A Car, Inc. v. Transp., Inc., 884 F. Supp. 584, 588 n.2 (D.D.C. 1995), aff'd, 82 F.3d 484 (D.C. Cir. 1996).

state law claims alleging misrepresentations made during marketing of condominiums where federal law claims alleged failure to disclose conflict of interest during sales of same condominiums); see also Ning Ye v. Holder, 667 F. Supp. 2d 103, 104 (D.D.C. 2009) (finding no supplemental jurisdiction over state law defamation claim because facts needed to prove defamation arose from "two entirely separate events" from those needed to be examined for federal claims); Burgess v. Omar, 345 F. Supp. 2d 369, 370 (S.D.N.Y. 2004) ("while facts relevant to one claim might provide background with respect to the other, more is required" (footnote omitted)).

     Nimellis argues that "the parties' relationship and history of dealings, including the nature and offerings of each business" are operative facts and that the counterclaims "provide motive, intent, context, and logical explanation" for the federal claims. Defs.' Opp'n to Pl.'s. Mot. [Docket Entry 29] at 1, 7 (Feb. 19, 2013) ("Defs.' Opp'n"). In support of this proposition, Nimellis cites to Seventh Circuit precedent holding that "a loose factual connection between the claims is generally sufficient" to constitute an overlap of operative facts under section 1367(a). See Ammerman v. Sween, 54 F.3d 423, 424 (7th Cir. 1995) (internal citation omitted). This argument is unpersuasive. Nimellis' "loose factual connection" standard has not been adopted in the D.C. Circuit, and district courts within the Seventh Circuit have interpreted it more narrowly than Nimellis portrays. See, e.g., Trilithic, Inc. v. Wavetek U.S. Inc., 6 F. Supp. 2d 803, 806 (S.D. Ind. 1998) (finding no supplemental jurisdiction where "the factual connection occurs among the background facts, as opposed to the operative facts"); United States v. Clark, No. 08 C 4158, 2010 WL 476637, at *1 (N.D. Ill. Feb. 3, 2010) (while a "loose factual connection" is sufficient, "facts linking state to federal claims must be operative, *i.e.*, they must be relevant to the resolution of the federal claims" (internal quotation marks omitted)).

Nimellis has not shown that the counterclaims provide a factual basis or overlap that will aid in the resolution of the Lanham Act claims; the facts raised by the parties' history and relationship, and even Nimellis' intent and motive, are simply not implicated beyond furnishing a general background for Wisey's narrow federal trademark, unfair competition, and unlawful cybersquatting claims. See CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione, Civil Action No. 10-4505, 2012 WL 195533 (E.D. La. Jan. 23, 2012) ("background about the dealings between the parties" is not operative facts); Council of Unit Owners of Wisp Condo., Inc. v. Recreational Indus., Inc., 793 F. Supp. 120, 122 (D. Md. 1992) (even though both state law and federal claims were "part of an ongoing, bitter dispute" between the parties, "[n]ot every dispute that arises between parties litigating a federal claim constitutes a part of the same Article III case"). Although they originate from the same general background facts, Nimellis has not proven that the two sets of claims are derived from a common nucleus of operative fact so as to satisfy section 1367(a).

In sum, the tort counterclaims do not have a legal overlap with the Lanham Act claims and the factual overlap exists only to the extent that the federal claims and counterclaims relate generally to the parties' broader background dispute. The counterclaims therefore do not derive from a common nucleus of operative fact with the Lanham Act claims. Accordingly, the Court will dismiss Nimellis' counterclaims for a lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Moreover, as discussed below, even if the Court had supplemental jurisdiction, it concludes that it should decline to exercise it.

## II.   Section 1367(c) Analysis

Wisey's also argues that even if the counterclaims satisfied section 1367(a), the Court should decline supplemental jurisdiction in its discretion pursuant to section 1367(c)(1) or

section 1367(c)(2). The Court agrees in part regarding section 1367(c)(1) and in total regarding section 1367(c)(2).

A. Section 1367(c)(1)

If the Court permitted the counterclaims to advance under section 1367(a), Wisey's argues that three legal questions inherent in the counterclaims each "raise a novel or complex issue of State law,"[6] which provides an independent basis for the Court to decline to exercise supplemental jurisdiction under section 1367(c)(1). First, Wisey's states that the Court would have to decide "whether a corporate entity is defamed under DC law by 'personal' statements about an owner"; second, the Court would have to determine "whether a corporate entity is liable under a theory of *respondeat superior* for alleged statements by an employee made outside the scope of employment"; and third, the Court would need to examine "a number of choice-of-law questions given that most of the alleged statements were made in Virginia, by a Virginia resident, concerning another Virginia resident." Pl.'s Reply to Defs.' Opp'n [Docket Entry 30] at 6 (Feb. 25, 2013) ("Pl.'s Reply").

The first issue appears to be novel to District of Columbia common law and the interpretation of that law in the U.S. District Court for the District of Columbia. Under Restatement (Second) of Torts § 561(a), a corporation may assert a claim of defamation when it is defamed by a personal attack against one of its agents in a manner that reflects upon the way the corporation does its business. See Restatement (Second) of Torts § 561(a) cmt. b (1977). However, because local District of Columbia courts have not had the opportunity to accept or decline the Restatement in this context, that issue would be one of first impression before this Court. If this Court were to adopt the Restatement standard, it would also need to decide whether

---

[6] Nimellis counters, without elaboration, that the issues Wisey's raises are "not particularly legally complex or novel." Defs.' Opp'n at 7.

accusing the owner of a restaurant of pedophilia reflects upon the way the restaurant does its business. Given that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law," Gibbs, 383 U.S. at 726, and out of an abundance of deference to the District of Columbia courts, this Court should decline to address the defamation claims invoking this issue.

Wisey's second section 1367(c)(1) argument, rather than contend that the counterclaims represent a novel or complex issue, seems instead to be an attempt to convince the Court that Wisey's employees were not within their scope of employment when they committed the alleged tortious acts. If the Court were to accept that argument, then respondeat superior would not apply and Wisey's would not be liable. See Penn Central Transp. Co. v. Reddick, 398 A.2d 27, 29 (D.C. 1979) (respondeat superior "allows the employer to be held liable for the acts of his employees committed within the scope of their employment" (internal citation omitted)). But scope of employment is generally a question for the trier of fact. Jordan v. Medley, 711 F.2d 211, 215 (D.C. Cir. 1983) (citing Penn Central Transport Co., 398 A.2d at 32). In any event, respondeat superior is an oft-litigated question and Wisey's has not shown a novel or complex issue of District of Columbia law here.

Wisey's third argument, that "the Court would also be faced with a number of choice-of-law questions given that most of the alleged statements were made in Virginia, by a Virginia resident, concerning another Virginia resident," Pl.'s Reply at 6, also does not raise a novel or complex issue of District of Columbia law. First, it appears to be factually inaccurate. Of seven alleged encounters, only two are specified to have taken place in Virginia. See Am. Countercls. ¶¶ 15, 17, 19, 20, 23, 24, 25. Then, if an alleged claim did occur in Virginia, the Court would

decide whether to use Virginia or District of Columbia law based on a choice-of-law analysis. See Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 842-43 (D.C. Cir. 2009) (describing general choice-of-law analysis); Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 857-58 (D.C. Cir. 2006) (describing choice-of-law analysis in defamation context). Should the Court find Virginia law applies, it can adjudicate the case under the law of that forum. See, e.g., Fawehinmi v. Lincoln Holdings, LLC, 895 F. Supp. 2d 148, 153 (D.D.C. 2012) (finding choice-of-law dictated using Virginia law and subsequently interpreting Virginia statute and common law in contract and tort claims). Hence, Wisey's has not alleged a choice-of-law question that is novel or complex.

With respect to 1367(c)(1), then, the Court agrees with Wisey's motion in part. While the defamation claims appear to be novel to District of Columbia law, the respondeat superior and choice-of-law issues that Wisey's raises are neither novel nor complex.

B. Section 1367(c)(2)

Under section 1367(c)(2), the Court may also decline to exercise supplemental jurisdiction when a state common law claim "substantially predominates over the claim or claims over which the district court has original jurisdiction." In general, "the question of whether state law predominates . . . must be answered by looking to the nature of the claims as set forth in the pleading and by determining whether the state law claims are more complex or require more judicial resources to adjudicate." Diven v. Amalgamated Transit Union Int'l & Local 689, 38 F.3d 598, 602 (D.C. Cir. 1994) (internal quotation marks omitted); see also Gibbs, 383 U.S. at 726-27 (if "state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals"); Lindsay v. Gov't Emps.

13

Ins. Co., 448 F.3d 416, 425 (D.C. Cir. 2006) ("predomination under section 1367(c)(2) relates to the type of claim").

Given the varied types of torts alleged and the judicial resources that would be required to adjudicate them, section 1367(c)(2) counsels using discretion in this case to decline supplemental jurisdiction. The four torts alleged in the counterclaims each require different elements of proof than the federal claims. Additionally, there are as many as seven altercations between the parties in two states, several witnesses[7] who would presumably only be called for the counterclaims, and the counterclaims could involve the application of both Virginia and District of Columbia law. Given the judicial resources it would take to preside over the counterclaims and their legal and factual separation from the federal claims, this Court should also decline supplemental jurisdiction under section 1367(c)(2).

## CONCLUSION

The counterclaims do not share a common nucleus of operative fact with the federal claims and thus do not satisfy section 1367(a). Because the Court cannot assert supplemental jurisdiction over the counterclaims it will grant the Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. Had the Court found the counterclaims satisfied section 1367(a), it still would have declined to assert supplemental jurisdiction over the defamation claims under section 1367(c)(1) and over all the counterclaims under section 1367(c)(2). Having found sufficient grounds to dismiss under Rule 12(b)(1), the Court will not reach the Rule 12(b)(6) motion.

---

[7] Nimellis names "patrons and employees" of Café Romeo's, two regular customers, "two of Mr. Ashgrizzadeh's employees," a Restaurant Depot cashier and two international work-study students, among others, as potential witnesses to the alleged defamatory or otherwise harassing incidents. See Am. Countercls. ¶¶ 20, 22, 23, 24, 25.

For these reasons, the Court will grant Wisey's motion to dismiss the amended counterclaims. A separate Order will issue on this date.

>                                    /s/
>                           JOHN D. BATES
>                    United States District Judge

Dated:  July 9, 2013